IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TROY J. VOICHOSKIE,                    )          CASE NO.  4:06CV3149
                                       )
          Plaintiff,                   )
                                       )
     v.                                )          MEMORANDUM AND ORDER
                                       )
SOCIAL SECURITY                        )
ADMINISTRATION, Michael J. Astrue,     )
Commissioner,                          )
                                       )
          Defendant.                   )

Plaintiff Troy J. Voichoskie ("Voichoskie"), seeks review of a decision by the defendant, Michael J. Astrue,[1] the Commissioner of the Social Security Administration ("SSA"), denying his applications for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq., and supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  After carefully reviewing the record, I conclude the SSA decision should be affirmed.

I.  PROCEDURAL BACKGROUND.

Voichoskie applied for social security disability benefits on July 30, 2003.  Social Security Transcript ("TR") at 75-77, 676-678.   Voichoskie claims his lower left leg injury, chronic pain, severe migraine headaches, head injury, depression, and short term memory loss have rendered him disabled and unable to work since February 21, 2001.  His

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.  Michael J. Astrue should be substituted for Commissioner Jo Anne B. Barnhart as the defendant, (Fed.R.Civ.P. 25(d)(1)), and this suit shall proceed pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

applications for disability benefits were denied initially on December 5, 2003, (TR 45-48), and upon reconsideration on March 9, 2004.  TR 51-55.

Voichoskie filed a hearing request on April 5, 2004, (TR 56), and the hearing was held before an Administrative Law Judge ("ALJ") in Norfolk, Nebraska, on April 7, 2005. TR 62, 687-736.  Testimony was received from Voichoskie, and from a vocational expert ("VE") who appeared at the ALJ's request.  TR 729-736.  The ALJ's adverse decision was issued on October 21, 2005, (TR 14-33), and Voichoskie's request for review by the Appeals Council was denied on April 27, 2006.  TR 8-10.  Voichoskie's pending complaint for judicial review and reversal of the SSA decision was timely filed on June 21, 2006. Filing 1 (Complaint).


## II.   THE ALJ'S DECISION.

The ALJ evaluated Voichoskie's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920.  TR 16-33.  As reflected in his decision, the ALJ made the following findings:

1.   Voichoskie  met the special earnings requirements under Title II of the Social Security Act on September 6, 2001, and continues to meet them;

2.   Voichoskie has not engaged in substantial gainful activity since September 6, 2001;

3.   The record establishes that Voichoskie has more than slight limitations in his ability to function due to prior fractures of his left leg and an organic mental disorder;

4.   Although Voichoskie's medically determinable impairments, either singly or collectively, impose some limitations upon his ability to perform work-related functions, they have not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Administrations' Regulation No. 4;

2

5.      Due to the limitations caused by his medically determinable impairments, Voichoskie is unable to perform his past relevant work as a material handler, assembler, production machine tender, or stock clerk;

6.      Despite his medically determinable impairments, Voichoskie possesses the residual functional capacity for other work that exists in the regional and national economies in significant numbers.

7.      To the extent he attempted to establish total disability through his hearing testimony, Voichoskie was not credible;

8.      Voichoskie is not disabled, as that term is defined under the Social Security Act;

9.      Voichoskie is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act;

10.    Voichoskie is not eligible for the payment of supplemental security income benefits under Title XVI of the Social Security Act.

TR 32-33.

## III.  ISSUES RAISED FOR JUDICIAL REVIEW.

Voichoskie raises the following arguments in support of his claim for reversal of the

SSA determination:

- The ALJ failed to accept as controlling the limitations and restrictions placed upon the plaintiff by his treating physician, Steven Gonzalez, M.D.

- The ALJ failed to give the opinions of Dr. Gonzalez the greatest weight based on his examining relationship, his treatment relationship, the frequency and nature of the treatment, the supportability of his opinions, and their consistency with the record as a whole.

- The ALJ failed to properly assess the plaintiff's testimony as required under Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) when determining the credibility of the plaintiff's subjective complaints.

- The ALJ found that Voichoskie had a residual functional capacity ("RFC") for unskilled work, but in finding the plaintiff could work, relied on the vocational expert's opinion that the plaintiff could perform the semi-skilled position of

3

telephone solicitor, a position for which the plaintiff had no transferrable skills.

Filing 9 (claimant's brief), pp. 19-20.

In response, the SSA states the ALJ did not disregard or discredit Dr. Gonzalez's opinion; specifically, the ALJ's RFC finding was actually more restrictive than Dr. Gonzalez's opinion, and consistent with Dr. Gonzalez's opinion, the ALJ concluded the plaintiff remained able to perform sedentary work. Filing 12 (SSA brief), pp. 15-16. The SSA further argues that the ALJ sufficiently explained why he concluded the plaintiff's testimony was not entirely credible, and in reaching this conclusion, properly evaluated that testimony in the context of the plaintiff's medical records and medical opinion evidence, use of medication, noncompliance with prescribed treatment regimens, and ability to participate in activities. Filing 12 (SSA brief), pp. 17-18. Finally, the SSA claims the ALJ was permitted to rely on the vocational expert's opinion regarding Voichoskie's ability to perform the telephone solicitor position because the expert explained how Voichoskie could perform the specific semi-skilled position of telephone solicitor though he was generally capable of performing only unskilled work. Filing 12 (SSA brief), pp. 12-16.

### IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of his hearing, Voichoskie was thirty years old. TR 690. He had completed a General Educational Development (GED) program and attended one and one-half years of college. TR 692. Voichoskie is able to read, write, and speak English. TR 107, 692. When tested in June of 2001, Voichoskie's reading, applied mathematics, and language aptitude scores were all at the high school graduate level. TR 156.

4

During the time period beginning in 1990 and until September 9, 2001, Voichoskie performed full-time work as an assistant manager for Taco John's, a construction worker, a material handler, an electronics assembler, and a production machine tender. After September 9, 2001, he worked part-time as a package handler while attending college, and as a production machine tender for one month in 2002. TR 244, 693-99. Voichoskie did not disclose the work he performed after September 9, 2001, in response to interrogatories. TR 237, 701.

Voichoskie claims he cannot work full-time because of left leg pain, severe migraine headaches, memory loss, and depression. TR 107, 700, 705. Voichoskie broke the tibia and fibula of his lower left leg while serving in the Army in 1997. This injury was severe, requiring open reduction and internal fixation with a tibial intramedullary rod and three screws. Though he regained the ability to ambulate, Voichoskie has ongoing complaints of continuous leg discomfort and claims this pain is exacerbated by walking. TR 454.

In July of 2002, Voichoskie filed an application to received vocational rehabilitation benefits from the State of Nebraska and the Veterans Administration. He was specifically seeking educational benefits. TR 179. His application was granted, and after reviewing the results of his aptitude and interest tests administered by the State, Voichoskie decided to pursue a bachelor's degree in computer information systems. TR 175. He began taking college classes at Wayne State College in the fall of 2001.

In September of 2001, Voichoskie fell while climbing a fence and again fractured his left leg. This new injury, a fracture of the left lateral malleolus, was distal from the prior injury. TR 425, 446, 448. Voichoskie claims this second injury exacerbated the severity

5

of his ongoing pain.  He further claims the severity of his pain affects his ability to concentrate and remember.  TR 705-06, 718-19.

Voichoskie successfully completed his college courses for the fall 2001 semester, and received a 3.06 accumulated grade point average for that semester's course work. His grades fell dramatically, however, during the spring 2002 semester.  TR 201. Voichoskie claims that due to severe pain, he missed a lot of classes and was unable to remember lessons and pass examinations. Voichoskie acknowledges, however, that he also missed school at least once because he drank too much alcohol the night before.  TR 719-20.

In April of 2002, Voichoskie sought treatment from Dr. Steven Gonzalez, a physician at the Primary Care Clinic, for "significant discomfort, burning, paresthesias and difficulty ambulating" due to his left leg injuries.  TR 413.  Though he had a "good orthopedic result" following his September 2001 accident, Voichoskie stated he was "unable to work due to extreme pain which at times is so severe as it interferes with cognition processes," that he had "difficulty with memory and difficulty staying on task," and "[a]s such he has been unable to matriculate in school and is at risk of losing vocational rehabilitation status."  TR 413.  Voichoskie related symptoms of "depression, insomnia, restlessness, irritability, chronic headaches, difficulty with cognitive processes and memory," and stated he was unable to drive due to leg pain.  TR 413.  Dr. Gonzalez prescribed Zoloft (an antidepressant), gabapentin (a pain reliever)[2], and naproxin (an anti-inflammatory).  He

---

[2]Gabapentin is the generic name for the medication distributed under the brand name "Neurontin."

6

also scheduled endocrine testing to rule out adrenal or thyroid gland dysfunction.  TR 414, 420.

The results of Voichoskie's thyroid testing were abnormal.  Dr. Gonzalez noted that Voichoskie was "profoundly hypothyroid which could account for his difficulty sleeping, mood changes, difficulty with attention and information storage."  TR 417.  Voichoskie was prescribed Synthroid, a thyroid replacement hormone.  TR 417.  However, before he began this medication, Voichoskie had already missed some of his final examinations and failed three of his classes, resulting in a cumulative grade point average of 1.091 for the spring 2002 semester.  TR 210.

Voichoskie enrolled in summer college courses and successfully completed both.  As of July 26, 2002, his hypothyroidism was clinically improved and he was able to concentrate and keep up with his academic workload.  TR 401-02.

However, during the fall of 2002, Voichoskie stopped taking his prescribed Synthroid.  TR 607.   When seen in November 2002, his TSH (Thyroid Stimulating Hormone) level was very high, (TR 397, 400), and Voichoskie was again experiencing symptoms of hypothyroidism.  He was extremely depressed, and had lost his job.  TR 399.  He also complained of severe headaches.  Dr. Gonzalez reminded Voichoskie that it was extremely important to take the prescribed antidepressant and thyroid medication.  TR 400.  Mental health counseling was offered to Voichoskie, but he deferred.  TR 399.  Voichoskie had enrolled in four fall 2002 classes, but withdrew from two of those classes and failed the other two.  Accordingly, his cumulative grade point average for that semester was 0.000.  TR 210.

On June 17, 2003, Voichoskie met with his vocational rehabilitation counselor and advised her that he was "thinking about applying for social security again because he questions his ability to work consistently given the frequent pain he experiences." TR 136. He asked the counselor for a letter stating he is unable to work. Voichoskie was told that the SSA would request his vocational rehabilitation records when it receives Voichoskie's application for benefits. Voichoskie was instructed to return the following Monday, after his scheduled appointment with Dr. Gonzalez, to schedule another appointment with the vocational rehabilitation counselor. TR 136. Thereafter, Voichoskie made no further contacts with the State or the VA regarding vocational rehabilitation services.

Voichoskie saw Dr. Gonzalez on June 20, 2003 and reportedly told the doctor he was "entirely compliant with medications." TR 388. However, he complained of more frequent headaches, "worse and now completely disabling" left knee and ankle pain, and severe depression. TR 389. He told Dr. Gonzalez that "Voc Rehab ha[d] labeled him as completely unemployable." TR 389. Dr. Gonzalez noted that Voichoskie appeared depressed, with many somatic complaints, but "in no distress." TR 389. Laboratory tests for thyroid function were ordered.

The results of Voichoskie's laboratory tests again indicated hypothyroidism. Voichoskie was contacted and told that his testing results indicated he was skipping Synthroid doses. Voichoskie acknowledged that it was very difficult for him to remember if he took his daily medication. He was again told it is extremely important to take this medication daily, and he was encouraged to purchase and use a daily pill box. TR 388.

On July 7, 2003, Voichoskie's vocational rehabilitation counselor sent him a letter asking if he remained interested in vocational rehabilitation services. Voichoskie did not

respond.  TR 135.  Voichoskie was scheduled to meet with his assigned VA case manager

on July 24, 2003 to discuss continued use of vocational rehabilitation services.  When he

failed to attend that meeting, the VA sent him a letter stating:

> You did not appear for your appointment.  You have stopped your
> attendance at Wayne State College with no apparent mitigating
> circumstances for this lack of attendance.  Since you cannot remain in this
> status and thus keep your established eligibility to vocational rehabilitation
> indefinitely, you need to contact me as soon as possible to discuss your
> plans for training.
>
> If you do not contact me personally **by writing to me** at the VA
> Regional Office by August 24, 2003 telling me of your interest in discussing
> your participation in the Vocational Rehabilitation program, we may have to
> formally discontinue your program of training.

TR 134 (emphasis in original).  Voichoskie did not respond, and his vocational

rehabilitation file was closed.  TR 133.

Voichoskie applied for a Veterans Administration disability reconsideration on July

30, 2003.  He had been receiving VA disability benefits, but claimed his disability rating

should be increased because of his increased pain.  TR 193.

Voichoskie saw Dr. Gonzalez again on August 25, 2003, after he fell down some

stairs and injured his left lower leg.  Dr. Gonzalez noted that Voichoskie's left ankle was

swollen and weight bearing was difficult.  Voichoskie also reported that his memory

continued to deteriorate, and he was seriously afraid he was losing his mind.  He continued

to complain of headaches.  Dr. Gonzalez referred Voichoskie for psychological testing and

a neurological consult.  TR 384.

Voichoskie's periodic thyroid function testing was performed on November 4, 2003.

The testing again revealed hypothyroidism.   Dr. Gonzalez's office attempted to contact

Voichoskie several times to discuss increasing his Synthroid dosage, but Voichoskie could not be reached.  TR 376.

A psychology consultation was performed on November 17, 2003.  Voichoskie produced an invalid profile on the MMPI-II, which was suggestive of "faking bad." TR 364. The evaluating psychologist concluded:

> V.  SUMMARY AND RECOMMENDATIONS:  This patient appears to be an individual of approximately average intelligence with a longstanding drug abuse problem.   The patient is also suffering from chronic pain and depression.    Possible diagnoses for this patient include marijuana dependence, history of alcohol dependence, major depressive disorder, adjustment disorder with depressed mood secondary to a medical condition. There also appears to be a strong element of malingering, and it appears that the patient may be in pursuit of disability.
>
> In as much as this, the patient is currently engaged in active use of marijuana and is suffering from untreated depression, it did not seem appropriate to do memory and other cognitive assessment at this time given the likely outcome. . . .   The patient was encouraged to give up his marijuana smoking and follow through with the treating physician's recommendations.  The patient was told that with some stabilization of his condition with a reduction in his depression and marijuana use, that his memory might well improve.  A re-consult to assess the patient's cognitive functioning . . . could them be considered at a later date.

TR 365.  See also TR 723-24.

Dr. Larry D. Birch examined Voichoskie on November 18, 2003.  Voichoskie told Dr. Birch that he had attended college, but  "was told eventually that due to his other injuries, he [would] never be hired by anybody and that [it] was silly for him to go ahead and complete his degree and computer programming."  TR 305.  He stated he had difficulty bending, twisting, getting up and down, kneeling, and squatting with his left leg, but he did not report difficulty sitting for prolonged periods of time. Voichoskie also stated he had

10

problems with concentration, but emphatically denied using street drugs.  After performing

the examination, Dr. Birch concluded:

> **Impression**: A young man with one significant post-injury residual in the left lower leg, causing leg foreshortening external rotation below the knee, very fragile looking soft tissue, and weakness and atrophy in the whole left leg compared with that of the right.  The claimant also appears to be somebody that acts almost like he is drugged.  He is somewhat slow and unresponsive.  He does not focus well.  He does not concentrate well.  It is unclear to me whether he really has closed head trauma or these are secondary effects to medicines he was prescribed or medicines he is using that [were] not prescribed.

> A gentleman with the above deficit to his left leg causing a great big deal of problems with employment that would require standing, lifting, changing positions, sitting job probably would be tolerated.  His status as far as mental function seems to be somewhat dull for unknown reasons at this time.

TR 308.    A neurology consultation was performed on December 8, 2003.  Though

Voichoskie complained of cognitive impairment, the doctor found no objective gaps in

memory during the examination.  TR 352.

Voichoskie received a prescription for physical therapy, and began the program on

November 21, 2003.   TR 594.   Though physical therapy appeared to be helpful in

alleviating Voichoskie's pain, (TR 585), he did not complete the program.  The February

5, 2004 discharge summary for the program states:

> The patient had order for an eight-week period of time at two times per week, but frequently had difficulty attending therapy.  He attended six visits out of the eight weeks of treatment, canceling frequently, not showing up for some appointments and had jury duty which kept him from therapy one week. . . . When last see on 01/15/04, at that time the patient was giving a subjective report of increased comfort in the left lower extremity with myofascial release treatment. . . .  Although he continued to limp, he did think that the strengthening of the soft tissue had given him some improved comfort level.  The patient was returning to his orthopedic physician after his last treatment.  We have not heard from him since that time.

TR 594.  See also TR 722.  When Dr. Gonzalez saw Voichoskie on February 24, 2004, he encouraged Voichoskie to participate in physical therapy again, and Voichoskie agreed to do so.  A three-month physical therapy program was prescribed.  TR 342.   There are no files of record indicating Voichoskie attended physical therapy again.   In May 2004, Voichoskie told his orthopedic doctor that "the physical therapist felt that therapy was actually making his left lower extremity worse versus better."  TR 561.  He told the VA 's pain clinic that he did not complete his physical therapy program because it increased his pain.  TR 643.

A mental health assessment was performed on March 22, 2004.  Voichoskie was diagnosed with depression, an antisocial personality disorder, and addictive disorders including alcohol abuse, cannabis abuse, and cocaine abuse.   Although Voichoskie continued to complain of memory loss, cognitive testing was delayed until Voichoskie was substance-free and his depression was treated.    Voichoskie's global assessment of functioning ("GAF") was 55.[3]  TR 506.  Voichoskie was encouraged to discontinue his use of mood-altering drugs, and he was offered a referral to the VA Medical Center's Substance Abuse Treatment Center (SATC), but he declined.  TR 506.

Voichoskie continued to experience migraine headaches once a week, but in June 2004, he reported that the prescription drug Zomig worked very well in alleviating that pain. TR 558.  Voichoskie was scheduled to complete neuropsychology testing that month, but

---

[3]A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. 2000)("DSM-IV-TR").

since he was not experiencing memory lapses at that time, the examination was cancelled. TR 558.

Voichoskie was referred to the VA Medical Center's Pain Clinic in May 2004. Voichoskie testified that the VA suggested Voichoskie may want a referral to Florida for additional pain management treatment and possible amputation of his leg.   TR 721. However, the medical records reveal that Voichoskie suggested having his leg amputated, but the doctor advised against amputation as a method for addressing Voichoskie's continuing pain symptoms of pain.   TR 561, 661.

On July 30, 2004, Voichoskie was seen by Dr. Hoff at the Veteran's Administration Medical Center (VAMC) for a reassessment of his disability rating.   Dr. Hoff's orthopedic assessment noted the following findings from the MRI of Voichoskie's left leg performed on February 4, 2004:

1.    Metallic artifact of the knee and ankle secondary to the intramedullary rod.
2.    Left distal fibula, mild deformity.
3.    Other wise normal MRI of the left ankle and knee.

TR 344, 646.  Following his examination of Voichoskie, Dr. Hoff concluded:

The veteran verbalized a significant amount of discomfort with walking and standing as well as sitting as well as palpitation of the wound in his left lower extremity.  Otherwise, there were no objective findings of weakness, excess fatigability, incoordination, lack of endurance, or loss in range of motion with repetitive use of the knee or ankle.

TR 545.

Dr. Gonzalez completed a functional capacity evaluation (FCE) of Voichoskie on August 9, 2004.  TR 328-30.  Dr. Gonzalez placed no restrictions on Voichoskie's use of his arms and hands.  He also concluded that Voichoskie could work eight hours a day with eight hours of sitting, but no standing or walking; could lift up to 20 pounds continuously,

carry up to ten pounds continuously, and carry up to twenty pounds frequently; could only seldom use his left foot or both feet for operating foot controls; could frequently bend and squat, and could seldom crawl, climb, work at unprotected heights, or work at a rapid pace. He further stated that Voichoskie would need to alter positions from sitting, standing, or walking one to three times a day for twenty minutes at a time, and needed to lay down for ten minutes during a work shift. From the perspective of physical limitations, Dr. Gonzalez found that Voichoskie could work full time, (TR 329), and remarked that Voichoskie's "[m]ajor limitation is psychiatric." TR 330. In his May 11, 2005 letter to Voichoskie's counsel,[4] Dr. Gonzalez explained:

> Mr. Voichoskie's physical problems are relatively mild, perhaps moderate. He has left leg discomfort from his previous fracture, which would impair his ability to ambulate for a prolonged distance, stand for more than 30 minutes, or do any sort of active physical labor. However, his lower extremity discomfort should not impair him from doing sedentary work.
>
> I am aware of Mr. Voichoskie's claim that it is difficult for him to do sedentary work as he has poor clarity of mind, poor organizational skills, and poor memory. He has related to me in the past that it is difficult for him to stay in school, as he cannot attend to the subject matter. He has been extensively evaluated and treated in our Mental Health Clinic. However, from my perspective his leg discomfort would not be disabling.

TR 652.

Voichoskie testified that in August 2004, his family members convinced him that using alcohol and marijuana to control his pain was doing more harm than good. TR 720. However, Voichoskie was concerned that he would be unable to withstand or control his pain if he stopped smoking marijuana. TR 720-21. He raised his concern with Dr.

---

[4]At the hearing, the ALJ noted that Dr. Gonzalez' opinions were not entirely clear under the record presented. He therefore asked Voichoskie's counsel to secure and submit additional information from Dr. Gonzalez. The May 11, 2005 letter represents Dr. Gonzalez' response to this request. The letter was made part of the record, and was considered by the ALJ. TR 25, 28.

Gonzalez, and on October 28, 2004, asked the pain clinic if he is a candidate for narcotic pain relievers.  TR  540, 720-21.  In evaluating this request, the pain clinic noted, "[m]any specialists have been involved in this patient's care.  It has been determined that no further therapy options exist except for the administration of chronic opioids.  The condition has been verified and alternative medications and or therapies have failed to control the pain."  TR 529.  Accordingly, Voichoskie was admitted to Dr. Gonzalez' chronic opioid pain management program and was prescribed dolophone[5] for his pain.  TR 529.  According to Voichoskie, these medications are more effective than marijuana at controlling his pain.  TR 720-21.

Voichoskie continues, however, to complain of debilitating pain in his left leg.  Voichoskie explained that on good days, he can arise from bed at approximately 7:00 a.m. and supervise his children as they prepare for school, but he is nonetheless experiencing painful discomfort in his leg and problems with balance.  He therefore uses a TENS unit[6] for about an hour to numb the pain, then does household chores for about two hours a day including filling the dishwasher, picking up the house, washing a load of laundry, picking up sticks in the yard, watering plants, or mowing with a riding lawn mower.  He cannot, however, use a push mower to mow the lawn because the walking causes pain.  TR 705-

---

[5]Dolophone is the generic name for the medication distributed under the brand name "Methadone."  Methadone is potentially addictive and in a class of medications called opiate (narcotic) analgesics.  Methadone treats pain by changing the way the brain and nervous system respond to pain. In conjunction with an approved drug treatment program, it can also be used as a substitute for opiate drugs of abuse by producing similar effects and preventing withdrawal symptoms in people who have stopped taking these drugs.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682134.html#side-effects.

[6]TENS stands for Transcutaneous Electrical Nerve Stimulation and is predominately used for nerve-related pain conditions.  A TENS unit sends stimulating pulses across the surface of the skin and along nerve strands.  These stimulating pulses help prevent pain signals from reaching the brain and help to stimulate the body's production of natural painkillers called "endorphins."  http://www.tensunits.com

09.  The remainder of his day is spent seated in a chair, with his leg elevated to the height of his chair and his foot on a pillow, watching movies or television, or reading books.  TR 709-10, 717.  Voichoskie testified that at least every other day, he also relaxes his muscles and joints by soaking in a hot tub for an hour while listening to classical music.  TR 710.  Voichoskie explained that he occasionally leaves the house during the day to run an errand or see his mother, but he cannot do the household shopping.  TR 711.  Voichoskie testified that on good days, he lifts twenty-five pounds occasionally, can lift and carry no more than ten pounds, can walk eight blocks, and can stand and move about for an hour or an hour and a half provided he is able to maintain his balance by resting his arms on a surface.  After being on his feet for an hour or an hour and a half, Voichoskie lays on the couch and uses a TENS unit for pain relief.  TR 711, 713, 715, 716.

Voichoskie testified that on his worst days, which occur one or two days a week, he stays in bed until the afternoon, or perhaps all day, due to severe leg and head pain,  (TR 700, 704-05, 716), and he claims that even after he is out of bed, he cannot accomplish any tasks or chores because he cannot think clearly.  TR 717.

According to Voichoskie, on average, the pain in his left leg is so severe that he cannot walk while carrying anything or stand for long periods of time.  TR 700, 704-05.  See also TR 240 (interrogatory responses).   Voichoskie's prescribed pain medications include:  Methadone (10 mg/three times per day), gabapentin (800 mg/three times per day), salicylates[7] (750 mg/two times per day), and Tylenol[8] (975 mg/three times per day).

---

[7]The word "salicylates" actually describes a group of medications.  Aspirin, acetylsalicylic acid, is one type of salicylate .

[8]Acetaminophen is the generic name for the medication distributed under the brand name "Tylenol."

TR 238.  Though Dr. Gonzalez historically had seen Voichoskie every other month to monitor his pain management, as of the time of the hearing, Voichoskie was scheduled to see Dr. Gonzalez only once a year.  TR 701.

Voichoskie's main side effect from his medications is constipation.  He also occasionally experiences brief episodes of blurry vision and mental confusion, often just prior to the onset of a migraine headache.  TR 703-04.

The ALJ asked the VE to assume someone with Voichoskie's age, education and work experience had the following abilities and impairments:

- He is able to bend and stoop; lift up to 10 pounds occasionally and 5 pounds frequently; and stand for two hours and sit for six hours in an eight-hour day provided he could change positions every thirty to forty-five minutes for a period of five to twenty minutes;

- He is unable to kneel, crawl, or squat; climb ladders or scaffolds, or use his left leg to operate pedal controls or machinery;

- He should avoid wet and slippery surfaces, and exposure to concentrated cold and vibration;

- His ability to follow and carry out detailed instructions, work in coordination with and proximity to others without being distracted, and interact appropriately in person with the general public is moderately limited.

TR 731-32.  These restrictions are consistent with Voichoskie's physical RFC assessment performed on May 9, 2002, (TR 257-64), and his mental RFC assessment performed on December 5, 2003.  TR 291-93.

Based on the assumptions and restrictions in the hypothetical question, the VE opined that Voichoskie was restricted to sedentary positions and  could not return to his past relevant work.  TR 731.  However, he testified that Voichoskie could perform a telephone solicitation job, with 25,458 of these jobs existing in Nebraska, Iowa, Missouri

17

and Kansas, with 6,398 of these jobs existing in Nebraska alone.  TR 733.   The VE explained:

> I'm thinking from a physical point of view, . . . telephone soliciting would be a good option with regard to flexibility for a sit/stand situation.  It would be a controlled environment, no wet, no cold, no heat, no use of pedals and it would be within the exertional level.  I'm thinking a phone solicitor would be a good situation and it would offer unlimited sit/stand options.  A cashier would involve a lot of people and public contact, so that's not an option. There's really no production assembler work or production kind of work at the 10/5 pound weight restriction.  With the combination of limitations, that's the only thing I can think of.

TR 732.

In response to the ALJ's questioning, the VE acknowledged that Voichoskie had no transferrable skills for the telephone solicitor position, and that the dictionary of occupational titles states this position requires thirty to ninety days of training.  However, based on his personal knowledge of the job market, the expert believed Voichoskie would be fully trained in less than thirty days.  The expert noted that people who have not completed high school can be trained to perform this job successfully.  TR 734-35.

However, assuming Voichoskie's testimony was fully credible, and he could not get out of bed until the afternoon one day a week, the VE opined that Voichoskie would be unable to perform substantial gainful work activity.  TR 733.  Likewise, if Voichoskie's pain was so severe that it interfered with his ability to concentrate, or if he needed to walk around for twenty minutes one to three times a day as Dr. Gonzalez reported, no jobs would be available.  TR 329,733.

18

V.   ANALYSIS.

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial

review of a "final decision" of the Commissioner under Title II, which in this case is the

ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether

the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel,

239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the
> Commissioner's decision, it must be affirmed.  Choate v. Barnhart, 457 F.3d
> 865, 869 (8th Cir. 2006).  "'Substantial evidence is relevant evidence that a
> reasonable mind would accept as adequate to support the Commissioner's
> conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting
> Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "The ALJ is in the best
> position to gauge the credibility of testimony and is granted deference in that
> regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).  Evidence that both supports and

detracts from the Commissioner's decision must be considered, but the decision may not

be reversed merely because substantial evidence supports a contrary outcome.  Id.  See

also Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

1.  Failure Properly to Evaluate and Rely on Dr. Gonzalez's Opinions.

Voichoskie claims the ALJ's disability finding and his hypothetical question posed

to the VE were inconsistent with the opinion of his treating general practitioner, Dr.

Gonzalez.

A treating physician's opinion is due "controlling weight" if that opinion is

"'well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the]

record.'"  "Although a treating physician's opinion is entitled to great weight,

19

it does not automatically control or obviate the need to evaluate the record

as whole."

Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007)(quoting Prosch v. Apfel, 201 F.3d 1010,

1012-13 (8th Cir. 2000)(quoting 20 C.F.R. § 404.1527(d)(2) (2000); and quoting Hogan v.

Apfel, 239 F.3d 958, 961 (8th Cir. 2001).   Moreover, even if the ALJ concludes the treating

source's medical opinion is not entitled to controlling weight, it may still be entitled to

deference and be adopted by the adjudicator.   SSR 96-2p, 1996 WL 374188 at *1 (S.S.A.,

July 2, 1996).   However, a treating physician's opinions must be considered along with all

the evidence.   Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).   "When a

treating physician's notes are inconsistent with his or her residual functional capacity

assessment, we decline to give controlling weight to the residual functional capacity

assessment."   Pirtle, 479 F.3d at 933.

Voichoskie argues that in determining the extent of Voichoskie's impairment and

restrictions, the ALJ substituted his own medical opinions for those of Dr. Gonzalez,

Voichoskie's treating physician.   He claims "[t]he ALJ . . . dismissed the various opinions

as to diagnosis and limitations of Dr. Gonzalez without providing any contrast between their

opinions and other medical opinions appearing elsewhere in the record.   The ALJ just

ignored them in finding what severe impairments the plaintiff had and what limitations were

caused by those impairments."   Filing 9 (claimant's brief), p. 26.   Voichoskie's brief does

not explain what impairments were allegedly ignored or excluded from the ALJ's

hypothetical question, or how those alleged exclusions potentially affected the VE's job

market analysis and opinions.

Dr. Gonzalez's records and findings are cited throughout the entirety of the ALJ's evaluation of the facts.  Citing and quoting from Dr. Gonzalez's records, the ALJ noted that when Voichoskie consistently took his prescribed medications, he reportedly felt better, his memory was improved, and he was able to keep up with his academic workload; when he failed to take his medications, his mental condition deteriorated.  TR 18-19.  The ALJ noted that from an orthopedic standpoint, Gonzalez believed Voichoskie had done well, (TR 18), but his reported leg pain nonetheless limited his ability to stand for long periods of time, ambulate for prolonged distances, stand for more than thirty minutes, or do any sort of physical labor.  TR 24, 25.

The ALJ outlined, with specificity, all of the restrictions set forth in the FCE prepared by Dr. Gonzalez.[9]  This form was essentially a checklist completed by Dr. Gonzalez with some additional comments added.   At the hearing, the ALJ noted internal inconsistencies within Dr. Gonzalez's FCE; specifically, that Dr. Gonzalez stated Voichoskie can stand or walk for only an hour during a work day due to leg pain, but also stated his impairments are primarily psychiatric.  TR 726.  The ALJ noted that the RFC and Dr. Gonzalez's FCE indicated Voichoskie could perform a "sitting job," (TR 727), but sought clarifying opinions from Dr. Gonzalez, particularly since Voichoskie testified that he could stand for an hour and a half a day, but could not sit upright for more than twenty minutes a day. Voichoskie requested leave to stand during his hearing to alleviate his pain from sitting.  TR 709,

---

[9]Such checklists are admissible, but due to the interpretive problems inherent in their use, they are entitled to little weight and do not constitute substantial evidence on the record as a whole.  O'Leary v. Schweiker, 710 F.2d 1334, 1341 (8th Cir. 1983).  See also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (checklist format and incompleteness of assessments limit their evidentiary value); Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997) (residual functional capacity checklists are entitled to little weight in the evaluation of a disability).

713-15.  As fully set forth in the ALJ's decision, Dr. Gonzalez responded by letter and characterized Voichoskie's physical problems as "relatively mild, perhaps moderate." Consistent with his FCE findings, Dr. Gonzalez' May 11, 2005 letter concluded Voichoskie's "lower extremity discomfort should not impair him from doing sedentary work." TR 652.

The ALJ's hypothetical question did not include Dr. Gonzalez's restriction regarding Voichoskie's need to walk away from his work site three times a day for twenty minutes at a time.  See TR 329.  However, Dr. Gonzalez's explanatory letter of May 11, 2005 contained no similar requirements, and there are no notations in either Dr. Gonzalez's medical records, or in the records of any other treating health care provider, encouraging or recommending that Voichoskie walk to alleviate his leg pain.  Moreover, at the hearing, Voichoskie consistently testified that walking was a source of significant pain.  He never described it as a method used for pain relief.   TR 706, 707-08, 713.

The ALJ's decision reflects that he relied substantially on the opinions of Dr. Gonzalez, and his hypothetical question to the VE was supported by the record as a whole. The restrictions identified by the ALJ in the hypothetical question were consistent with the RFC findings, and to the extent that Dr. Gonzalez's FCE restrictions were not inconsistent with his own records, his May 11, 2005 letter, or Voichoskie's testimony, the FCE restrictions were substantially the same if not less restrictive than those included in the ALJ's hypothetical question.  Compare TR 257-64 (physical RFC); TR 328-30 (FCE); and TR 731-32 (hypothetical question).   Under such circumstances, there is no merit to Voichoskie's claim that the ALJ ignored or failed to give due weight to the opinions of his treating physician, Dr. Gonzalez.   See e.g. Pirtle, 479 F.3d at 935 (affirming denial of

22

social security claimant's appeal where the ALJ's hypothetical question modified or omitted rest period restrictions set forth in the physician's FRC that were neither mentioned in the doctor's treatment notes nor identified by the claimant as helpful).

    2.  Failure to Properly Assess Voichoskie's Credibility.

Voichoskie claims the ALJ failed to properly assess his credibility. Filing 9 (claimant's brief), p. 28. The ALJ found that "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis," Voichoskie's testimony was not credible.

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of subjective symptoms, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000)(citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole. Id. at 972. The ALJ is not required to discuss methodically each Polaski consideration, so long as the ALJ acknowledges and examines those considerations before discounting the subjective complaints, (id.(citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)), and makes "express credibility findings," and "explain[s] the record inconsistencies that support those findings." Dolph v. Barnhart, 308 F.3d 876, 879 (8th Cir. 2002).

The ALJ's decision explicitly outlined numerous facts he considered in concluding Voichoskie was not entirely credible.  The ALJ noted that although Voichoskie claimed he could not sit upright for long periods of time, Dr. Gonzalez and Dr. Birch, who performed a consulting examination, both concluded Voichoskie was capable of performing sedentary work.  Though Voichoskie testified that he needed to elevate his foot while relaxing at home and could not get out of bed every day, the ALJ noted that Dr. Gonzalez's FCE stated Voichoskie could work full time and did not need to elevate his foot. TR 29.   Citing to and relying upon specific citations to the medical records of Dr. Gonzalez and Dr. Hoff, the ALJ commented that "in spite of the alleged severity of the Claimant's symptoms and limitation, there is little in the way of objective findings" to explain these symptoms.  TR 28. A neurology consultation was performed on December 8, 2003, by Karen L. Stanek, M.D. Though Voichoskie complained of cognitive impairment, the doctor found no objective gaps in memory during the examination.  TR 352.  The absence of medical evidence supporting a claimant's subjective complaints, although not dispositive, is a factor to be considered in assessing the claimant's credibility.  Lowe v. Apfel, 226 F.3d at 972; Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

The ALJ further noted that Voichoskie was offered but declined mental health counseling, failed to consistently take his thyroid medication despite repeated reminders to do so, and was discharged from physical therapy for failing to attend scheduled treatments or contact the therapist.  TR 29.   See, e.g., Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991) ("The ALJ may properly consider . . . the claimant's willingness to submit to treatment . . . to determine the sincerity of the claimant's allegations of pain.") If a condition can be controlled with medication or treatment, it is not disabling.  Estes v.

24

Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citing Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ specifically cited to the records of at least four health providers who questioned whether Voichoskie's complaints were "contrived," or exaggerated, or whether Voichoskie gave full effort during his physical examination.   The ALJ further cited to Voichoskie's November 2003 psychological evaluation; specifically noting Voichoskie's "invalid profile" on the MMPI-II indicated he was "faking bad," and the evaluator's comment that there "appears to be a strong element of malingering" by a patient "in pursuit of disability."   TR 29.   "[A] claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." Ramirez v. Barnhart, 292 F.3d 576, 582 n.4 (8th Cir. 2002).

Finally, the ALJ commented on inconsistencies between Voichoskie's own statements and the record.   Specifically, Voichoskie admitted to ongoing illegal drug use to one doctor, but emphatically denied such use to a different doctor only five days later, (TR 29-30); he did not complete vocational rehabilitation, and testified and told Dr. Gonzalez that he quit the program because he was told he was unemployable, yet the vocational rehabilitation records reveal his file was closed for failing to either attend school or scheduled appointments for no apparent reason, (TR 29-30); and he disclosed jobs performed after September 6, 2001 to the vocational rehabilitation program that were not disclosed in his responses to interrogatories or during his testimony.  TR 30.  McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir. 1996)(affirming the ALJ's credibility determination where there was no objective medical evidence to support claimant's complaint, the

claimant did not consistently take prescribed medications, and her daily activities and answers to medical questionnaires were inconsistent with her complaints of disabling pain).

The ALJ's decision specifically describes: 1) inconsistencies between Voichoskie's complaints and the objective medical findings; 2) Voichoskie's failure to comply with recommended and prescribed treatment and rehabilitation programs; 3) his inconsistent statements to medical providers; 4) his mental health testing indicating he may be malingering; and 5) the notations of treating health providers indicating they suspected his complaints were exaggerated.  This analysis sufficiently explains the record inconsistencies supporting the ALJ's credibility determination.  Voichoskie's claim that the ALJ failed to properly assess must be denied.

3.  Relying on VE Testimony that Conflicted with DOT Job Definitions.

The VE testified that Voichoskie is able to perform the semiskilled occupation of telephone solicitation even though he has a residual functional capacity for unskilled work. Relying on this testimony, the ALJ concluded Voichoskie remains able to perform jobs existing in significant numbers in the regional and Nebraska economy.  Voichoskie claims the ALJ's reliance on this VE testimony was erroneous and violated SSR 83-10 and SSR 00-4p. He therefore argues that the SSR's decision denying his claim must be reversed. Filing 9 (claimant's brief), pp. 19, 22-24.

"Unskilled work" involves simple duties that can be learned on the job in a short period of time and requires little or no judgment. 20 C.F.R. § 404.1568 (a).  A person can usually learn to do the job classified as unskilled work in thirty days or less with little specific vocational preparation.  Id.; SSR 82-41.  The majority of unskilled jobs are

26

identified in the Department of Labor's Dictionary of Occupational Titles (DOT).  SSR 82-41.

"Semiskilled work" is work that requires some skills but not an ability to perform more complex work duties.  20 C.F.R. § 404.1568 (b).   Semiskilled jobs contain more variables and require more judgment than unskilled occupations.  SSR 82-41.  However, even though semiskilled occupations may require thirty to ninety days to learn, the content of work activities in some semiskilled jobs may be little more than unskilled.  SSR 82-41. Therefore, it is SSA policy to pay close attention to the actual complexities of particular jobs in terms of dealing with data, people, or objects and to the judgments required to do the work.  SSR 82-41.

The DOT lists a specific vocational preparation (SVP) time for every occupation described.   Unskilled work corresponds to an SVP of 1 or 2, while semiskilled work corresponds to an SVP of 3 or 4.  SSR 00-4p.  Under the DOT, the job of telephone solicitor, (also known as a telemarketer or telephone sales representative), is defined as sedentary work at SVP level 3.   Dictionary of Occupation Titles, 299.357-014 (4th ed. 1991).

Social security claimants who cannot return to their past employment are "not expected to do more complex jobs than they have actually performed."  SSR 82-41,  ¶ 4. "[A]n individual does not gain skills that could potentially transfer to other work by performing unskilled work."  SSR 00-4p (*Transferability of Skills*).  Accordingly, Voichoskie claims the ALJ was not allowed to rely on the VE's testimony stating Voichoskie, who has previously performed unskilled work at SVP levels 1 or 2, could perform a semiskilled position of telephone solicitor at SVP level 3.

SSR 00-4p states:

Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4p ("*Resolving Conflicts in Occupational Information*").   See also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003)("[A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications. . . .").

The ALJ's decision must explain how any conflict between the VE's testimony and the DOT job description was resolved.  SSR 00-4p ("*Explaining the Resolution*").  In resolving the conflict, the ALJ may consider whether the VE possesses information not listed in the DOT about a specific job.  "DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."  Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)(citing Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997).  These descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  Id.  The DOT's definition of an "occupation" is a collective description of numerous jobs, and information "about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from

28

employers, or from a VE's . . . experience in job placement or career counseling." SSR 00-4p. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Wheeler, 224 F.3d at 897 (citing Hall v. Chater, 109 F.3d at 1259)).

Citing Flesner v. Social Security Administration, 4:06-cv-03010 (D. Neb. Aug. 31, 2006)(Kopf, J.), Voichoskie claims the ALJ lacked sufficient evidence to explain the conflict between the VE's testimony that Voichoskie could perform a telephone solicitor job and the DOT definition classifying this position as beyond Voichoskie's skill level. In Flesner, the VE testified that the claimant, who had previously performed unskilled work, could perform a telephone solicitor position. The VE's sole explanation for this testimony was his belief that the position was, in reality, "low semi-skilled work," "that would not normally bother anyone with a high school education," and is performed by "some people without a high school education." Flesner v. Social Security Administration, 4:06-cv-03010, filing 6 (transcript), pp. 376-77. The ALJ in Flesner relied on this testimony in concluding that the claimant could perform the position of telephone solicitor, and his decision contained no explanation of how the conflict between the VE's testimony and the DOT job description was resolved. SSR 00-4p. In reversing the SSA determination, Judge Kopf held:

> Essentially, the VE testified that the phone solicitor occupation is over-classified in the DOT at the SVP 3 level because it can be performed by persons without high school educations. Not only does this explanation confuse job training requirements with educational requirements, but it effectively demotes the occupation of phone solicitor from semi-skilled to unskilled employment. . . . [T]his case does not involve "an evidentiary conflict between the VE and the DOT," but, rather, "a legal conflict between the VE and the SSA over the definition of a regulatory term, and the VE's testimony cannot prevail."

29

Flesner, 4:06-cv-03010 at p. 19(quoting Steward v. Barnhart, 44 Fed. Appx. 151, 152-53, 2002 WL 1791513, *1 (9th Cir. Aug. 5, 2002)).

Flesner is distinguishable from this case.  At Voichoskie's hearing, the VE not only testified that people without a high school education can perform a telephone solicitor position, but he further explained that based on his professional experience with the job market, Voichoskie would be fully trained for this position in less than thirty days.  See TR 733-34.   The ALJ's written decision explains how the ALJ resolved the conflict between the DOT definition of a telephone solicitor and the VE's testimony as follows:

> [T]he vocational expert identified the sedentary occupation of telephone solicitor which he also noted involves an unlimited sit/stand option.  The vocational expert testified that such occupation is listed in the Dictionary of Occupational Titles as an SVP3 position (i.e. a position with a specific vocational preparation time of 30 to 90 days); however, based on his professional experience, which includes having observed people in the marketplace performing such position[s] who have not even completed high school, the Claimant would be able to pick up such [a] position in less that 30 days.

TR 31.

Unlike Flesner, the VE's testimony did not purport to redefine a telephone solicitor position as an unskilled job based solely on the education level of those employed in the position. Rather, the VE explained the training requirements actually applied in the marketplace for the specific job of telephone solicitor.  The ALJ found this testimony persuasive, and concluded Voichoskie could be trained for a telephone solicitor job in less than thirty days.

There is sufficient evidence in the record to rebut the DOT's classification of telephone solicitor as a semi-skilled, SVP level 3 position.  See e.g. Dobbins v. Barnhart, 182 Fed.Appx. 618, 619, 2006 WL 1478969, *1 (8th Cir.  2006)(holding the DOT-defined

physical "sitting" requirements for a surveillance monitoring job were adequately rebutted by the testimony of a VE who, based on his consultation with potential employers, explained that not all employers require such sitting abilities); Gleave v. Barnhart, 76 Fed.Appx. 142, 144, 2003 WL 22171488, *1 (9th Cir. 2003)(holding that although the DOT classifies telemarketing as a semi-skilled position, that definition was adequately rebutted where the VE's testified that in her many years of research and placing individuals, she had never encountered an instance in which previous work experience made any difference, and people should be able to step into that job without any previous experience or skills obtained from other jobs); Holcom v. Barnhart, 79 Fed.Appx. 397, 399, 2003 WL 22422421, *2 (10th Cir. 2003)(holding VE testimony adequately explained any variance between the exertional requirements of the jobs identified by the VE and their descriptions in the DOT where the VE explained that based on her experience in observing these jobs and in placing people in these, the Claimant could perform the jobs identified).   Accordingly, Voichoskie's claim that the ALJ erred in finding he can perform a telephone solicitor position must be denied.

I find that substantial evidence supporting the ALJ's decision exists on the record as a whole.

THEREFORE, IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

DATED this 24th day of April, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

31